IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CABELA'S LLC,

       Plaintiff,

   v.

MATTHEW HIGHBY and MOLLY
HIGHBY,

       Defendants.

No. 18-cv-1223-RGA

## MEMORANDUM ORDER

Presently before the Court is Plaintiff's motion for preliminary injunction. (D.I. 70). I

have considered the parties' briefing. (D.I. 71, 78, 91). I heard oral argument on December 21,

2018. (D.I. 107).

## I.    BACKGROUND

On July 31, 2018, Plaintiff Cabela's brought an action against Matthew Highby, Molly

Highby, and Highby Outdoors, LLC (collectively "Defendants") in the Court of Chancery of the

State of Delaware. (D.I. 1 ¶ 1). Defendants removed the case from the Court of Chancery to this

Court. (*Id.* at 5). Cabela's has voluntarily dismissed without prejudice its claims against Highby

Outdoors. (D.I. 17). I denied Defendants' motion to dismiss, or in the alternative, to transfer to

the District of Nebraska. (D.I. 74).

Cabela's brings claims for breach of contract and misappropriation of trade secrets under

the Nebraska Trade Secrets Act.[1] Defendants Mr. and Mrs. Highby are former employees of

---

[1] This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

Cabela's and the founders of Highby Outdoors. Both left Cabela's shortly after its merger with

Bass Pro Group LLC ("Bass Pro"). (D.I. I ¶¶ 3, 5). Cabela's contract claims stem from two

agreements—a Proprietary Matters Agreement ("PMA") and a Confidential Severance

Agreement and General Release ("Severance Agreement"). (D.I. 1 ¶¶ 38–43). Each Defendant

signed a PMA in exchange for company stock while employed (D.I. 1-1, exs. 1–2), and a

Severance Agreement upon termination of employment (D.I. 1-1, exs. 4–5).

Cabela's now moves for a preliminary injunction based on alleged violations of the PMA

and misappropriation of trade secrets. (D.I. 70, 71). Specifically, Cabela's seeks to enjoin

Defendants from violating the noncompetition, nonsolicitation, and confidentiality provisions of

the PMA. (D.I. 70). The relevant sections of the PMA provide:

1. Nondisclosure of Confidential Information.

(a) *Access.* Employee acknowledges that employment with Company or any of its
affiliates necessarily has involved, and will involve, exposure to, familiarity with, and
the opportunity to learn highly sensitive, confidential, and proprietary information of
Company, which may include, without limitation, information about Company's
products and services, markets, customers, and prospective customers, the buying
patterns and needs of customers and prospective customers, purchasing histories with
vendors and suppliers, contact information for customers, prospective customers,
vendors and suppliers, miscellaneous business relationships, investment products,
pricing, quoting, costing systems, billing and collection procedures, proprietary
software and the source code thereof, financial and accounting data, data processing
and communications, technical data, marketing concepts and strategies, business
plans, mergers and acquisitions, research and development of new or improved
products and services, and general know-how regarding the business of Company and
its products and services (collectively referred to herein as "Confidential
Information"). . . .

(b) *Valuable Asset.* Employee further acknowledges that the Confidential Information is
a valuable, special, and unique asset of the Company, such that the unauthorized
disclosure or use by Employee or persons or entities outside the Company would
cause irreparable damage to the business of Company. Accordingly, Employee
agrees that, during and after Employee's employment with Company or any of its
affiliates, Employee shall not directly or indirectly disclose to any person or entity or
use for any purpose or permit the exploitation, copying, or summarizing of any
Confidential Information of Company, except as specifically required in the proper
performance of Employee's duties for Company. . . .

. . . .

4. Nonsolicitation of Customers.

In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, . . . Employee will not . . . call on, solicit the business of, sell to, service, or accept business from any of Company's customers (with whom Employee had personal contact and did business with during the eighteen (18) month period immediately prior to the termination of Employee's employment) for the purpose of providing said customers with products and/or services of the type or character typically provided to such customers by Company.

5. Nonsolicitation of Vendors.

In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, . . . Employee will not . . . :

(a) Encourage, discourage, interfere with, or otherwise cause, in any manner, any business partner, independent contractor, vendor, or supplier of Company to curtail, sever, or alter its relationship or business with Company; or

(b) Solicit, communicate, or do business with any of Company's business partners, independent contractors, vendors, or suppliers (with whom Employee had personal contact and did business with during the eighteen (18) month period immediately prior to the termination of Employee's employment) for or on behalf of a Competitor (as defined by Section 7, below).

6. Nonsolicitation of Employees.

Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, . . . Employee will not . . . hire, employ, or solicit for employment any employee of Company with whom Employee had personal contact or about whom Employee received Confidential Information while employed by Company or any of its affiliates.

7. Noncompetition.

In order to prevent the improper use of Trade Secrets and Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of

Employee's employment for any reason whatsoever, . . . Employee will not . . . perform services within the United States of America or Canada for a Competitor that are the same as or similar to the services Employee performed for Company during the eighteen (18) month period immediately prior to the termination of Employee's employment. For purposes of this Agreement, a "Competitor" of Company shall mean Bass Pro Shops, Gander Mountain, Sportsman's Guide, The Sportsman's Warehouse, Orvis, Dick's Sporting Goods, The Sport's Authority, Big 5 Sporting Goods, Scheels, L.L. Bean, Lands' End, REI, Academy, Amazon.com, Field & Stream, Wholesale Sports, Sail, Le Baron, Mountain Equipment Co-op, Canadian Tire, The Fishin' Hole, Northwest Company, or any other multi-state, multi-province, and/or multi-channel retailer engaged in the sale of products and/or services associated with hunting, fishing, or camping.

8. Reasonable Restrictions.

. . . .

(b) *Tolling*. In the event Employee is in breach of the post-employment obligations of this Agreement, the eighteen (18) month post-employment enforcement period of this Agreement shall be tolled, until such breach is ended unless an injunction is in place to protect Company's interests, up to a maximum extension of eighteen (18) months.

A similar case, *Cabela's LLC v. Wellman*, is proceeding before the Delaware Court of Chancery. Like the Highbys, several defendants in *Wellman* are former Cabela's employees who signed a PMA in exchange for company stock. I believe the PMAs in *Wellman* are substantively identical to the PMAs in this case. Cabela's moved for preliminary injunction based in part on breach of the same PMA provisions at issue in this case. The Court of Chancery granted the motion in part, enjoining the defendants from violating the PMA nonsolicitation and confidentiality provisions. *Cabela's LLC v. Wellman*, 2018 WL 5309954 (Del. Ch. Oct. 26, 2018). The Vice Chancellor denied the defendants' motions for reargument. (D.I. 102, Ex. 1).

## II.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24.

## III. ANALYSIS

### A. Success on the Merits

#### 1. Cabela's Is Not Barred by Acquiescence or Estoppel from Asserting the PMA Against Defendants

Defendants argue that Cabela's was aware of their plans to open a competing business and is therefore barred from asserting the PMA against Defendants by the doctrines of acquiescence and estoppel. (D.I. 78 at 17–18).

"A claimant is deemed to have acquiesced in a complained-of-act where he: has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (internal citations omitted). Acquiescence does not require showing that the claimant had conscious intent to approve the act, nor that the other party changed position or was prejudiced. *Id.*

In contrast, equitable estoppel requires reliance, change of position, and prejudice. The party claiming estoppel must show that he "lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; relied on the conduct of the party against whom estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance." *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990).

Defendants rely on the same facts to support both acquiescence and estoppel. Defendants assert that Mr. Highby openly discussed his intent to pursue Highby Outdoors while still employed at Cabela's. He claims to have contacted his supervisor Ed Larson (D.I. 79-1, Ex. 11

at 48:12–14, 50:14–23, 55:9–13), Cabela's Director of Inventory Mark Onstott (*id.* at 60:14–23),

Bass Pro General Merchandise Manager Dean Snelson (*id.*), and Cabela's head of HR (also Mr.

Highby's sister) Sarah Kaiser (*id.*), all of whom allegedly encouraged him to go ahead with the

business. (D.I. 78 at 5–6). Moreover, Mr. Highby asserts that Mr. Larson informed him that the

PMAs would no longer be enforced following the Bass Pro merger. (D.I. 78 at 5; D.I. 79-1, Ex.

11 at 47:11–20, 51:13–52:18). Mr. Highby also reached out to Cabela's Director of Real Estate

Steven Krajewski about leasing land from Cabela's to open Highby Outdoors. Mr. Krajewski

denied the request on the basis that Bass Pro would not lease a Cabela's building "to any

competitor," but did not specifically oppose the operation of Highby Outdoors. (D.I. 78 at 6;

D.I. 79-1, Ex. 21).

Defendants rely heavily on Mr. Highby's testimony.[2] As Cabela's notes, much of that

testimony is inconsistent with other parts of the record. Mr. Larson denies both having

encouraged Mr. Highby to develop a competitive business (D.I. 91-2, Ex. 63 at 25:7–11), and

having informed Mr. Highby that the PMAs would not be enforced post-merger (D.I. 96, Ex. 64

at 47:21–48:22). Mr. Snelson testified that Mr. Highby only told him about his intent to open a

business "making pallets," which would not compete with Bass Pro/Cabela's. (D.I. 91-2, Ex. 59

at 22:14–24:14). Ms. Kaiser testified that she does not recall Mr. Highby ever contacting her to

discuss a competitive business while he was still at Cabela's (D.I. 91-2, Ex. 58 at 50:24–51:9),

---

[2] Defendants also cite to testimony from Jamee Guggenmos and Mark Dowse as evidence that Cabela's told employees the PMA would not be enforced. (D.I. 107 at 50:10–52:2; D.I. 79-1, Ex. 5 at 14:10–15:5 (Dowse deposition), Ex. 15 at 33:1–18 (Guggenmos deposition)). I question the weight of Mr. Guggenmos's testimony as he left Cabela's for Highby Outdoors. Defendants assert that Mr. Dowse remains at Cabela's and is a "true third party." (D.I. 107 at 51:8–11). Cabela's responds that Mr. Dowse has a personal relationship with Defendants. (*Id.* at 62:11–15). Based on the record before me, I understand that Mr. Dowse knew Defendants, but the nature of their relationship is unclear. (D.I. 79-1, Ex. 5 at 16:24–17:16).

and that she first learned about Highby Outdoors after Mr. Highby had left the company (*id.* at 54:13–16). Mr. Onstott has not been deposed. (D.I. 91 at 7 n.9; D.I. 107 at 31:1–4).

Based on the present record, it seems unlikely that Defendants will be able to meet their burden of showing either acquiescence or estoppel. It is unclear whether Mr. Highby actually sought approval for a competing business, let alone that approval was granted or acquiesced to. Mr. Highby's testimony is largely rebutted by the testimony of those he claims to have sought approval from, namely Mr. Larson, Mr. Snelson, and Ms. Kaiser. Therefore, Cabela's has shown it is likely to succeed against Defendants' acquiescence and estoppel defenses.

## 2. The PMA is Governed by Nebraska Law

The PMA includes a Delaware choice-of-law provision.[3] Delaware follows the Restatement (Second) of Conflict of Laws ("the Restatement").[4] *Coface Collections N. Am. Inc. v. Newton*, 430 Fed. App'x 162, 167 n.7 (3d Cir. 2011); *Wellman*, 2018 WL 5309954, at *7. Under section 187(2) of the Restatement, the parties' choice of law will control an agreement unless (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be applicable law in the absence of an effective choice of law by the parties. The parties only dispute whether the second exception applies. (D.I. 71 at 9; D.I. 78 at 13).[5]

---

[3] I previously found all obligations under the PMA, including the choice-of-law provision, preserved and not superseded by the parties' subsequent Severance Agreements. (D.I. 74 at 2–6).

[4] As a federal court exercising diversity jurisdiction, we apply the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497 (1941).

[5] The first exception does not apply because Cabela's is incorporated in Delaware. A substantial relationship is met when the chosen state is where one of the parties is incorporated. *Coface*, 430 Fed. App'x at 167.

The parties agree that absent the Delaware choice-of-law provision, Nebraska law would govern the PMA. (D.I. 71 at 8–9; D.I. 78 at 13). Thus, under section 187(2)(b) of the Restatement, Nebraska law applies if (i) application of Delaware law would be contrary to a fundamental policy of Nebraska, and (ii) Nebraska has a materially greater interest than Delaware in the PMA. I believe the PMA meets both elements and is thus governed by Nebraska law. For the reasons discussed below, I find both the noncompetition and nonsolicitation provisions of the PMA invalid and unenforceable under Nebraska law.

### a. Application of Delaware Law Would be Contrary to Nebraska's Fundamental Policy Against Contracts in Restraint of Trade

Nebraska law clearly states that "all contracts in restraint of trade are against public policy and void." *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 127 (Neb. 2014) (discussing both Nebraska common law and statutes). A covenant not to compete is only valid if it meets three "reasonableness requirements." The restriction must be "(1) reasonable in the sense that it is not injurious to the public, (2) not greater than is reasonably necessary to protect the employer in some legitimate interest, and (3) not unduly harsh and oppressive on the employee." *Id.* at 127–28 (quoting *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 638 (Neb. 2008)). Courts should first determine, under the second requirement, whether the restriction aids some legitimate interest of the employer. *Id.*

"[A]n employer has a legitimate business interest in protection against competition by improper and unfair methods," but may not constrain "ordinary competition." *Chambers-Dobson, Inc. v. Squier*, 472 N.W.2d 391, 398 (Neb. 1991) (internal quotation marks omitted). To distinguish between "unfair" and "ordinary" competition, the Nebraska Supreme Court has stated:

Legitimate interests of an employer which may be protected from competition include: the employer's trade secrets which have been communicated to the employee during the

8

course of employment; confidential information communicated by the employer to the employee, but not involving trade secrets, such as information on a unique business method; an employee's special influence over the employer's customers, obtained during the course of employment; contacts developed during the employment; and the employer business's development of goodwill.

*Gaver*, 856 N.W.2d at 130–31 (quoting 54A Am. Jur. 2d § 906 at 208 (2009)); *Chambers-Dobson*, 472 N.W.2d at 399. An employer generally may not prohibit former employees from use of "some general skill or training acquired while working for the employer, although such on-the-job acquisition of general knowledge, skill, or facility may make the employee and effective competitor for the former employer." *Gaver*, 856 N.W.2d at 131.

Delaware law is less restrictive. Noncompetition agreements will be enforced if they are "reasonable in scope and duration, . . . advance a legitimate economic interest of the [former employer], and . . . survive a balance of the equities." *Wellman*, 2018 WL 5309954, at *9 (quoting *Weichert Co v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007)). An agreement prohibiting ordinary competition is enforced so long as it is not "oppressive to an employee." *Id.*

Here, the PMA includes a noncompetition provision that prohibits the employee, for eighteen months following termination, from performing services, in the U.S. or Canada, for a "competitor" that are "the same as or similar to" services performed for Cabela's. (D.I. 1-1, Ex. 1 § 7). The provision names numerous entities as competitors, as well as "any other multi-state, multi-province, and/or multi-channel retailer engaged in the sale of products and/or services associated with hunting, fishing, or camping." (*Id.*). In *Wellman*, the Court of Chancery found this provision to be a restraint on ordinary competition (an illegitimate business interest) and thus in conflict with a fundamental policy of Nebraska. 2018 WL 5309954, at *9.

Cabela's argues that *Wellman* misapplied Nebraska law. Defendants allegedly had access to confidential information while employed. (D.I. 71 at 11). Therefore, Cabela's asserts that the

9

PMA noncompetition restrictions are reasonably necessary to protect Cabela's from misappropriation of confidential information, a legitimate business interest. (*Id.*).

Cabela's relies on *Securities Acceptance Corp. v. Brown*, 106 N.W.2d 456, 411 (Neb. 1960), which is inapposite. *Securities Acceptance* addressed a noncompetition agreement that prohibited the former employee, for eighteen months after termination, from "work[ing] for or assist[ing] any competitive business in any city or the environs or trade territory thereof in which the Employee shall have been located or employed by the Employer." *Id.* at 460. The court did not discuss confidential information. Rather, the court found the post-employment restrictions aided the legitimate interest of protecting the employer's good will. *See id.* at 464 (discussing the defendant's "knowledge of or acquaintance with patrons or customers of his former employer," which allowed him to gain an unfair competitive advantage). Further, the court ultimately found the restrictions void because the eighteen-month time limitation was not reasonably necessary to protect the employer's legitimate interest. *See id.* at 466–67.[6]

I agree with the *Wellman* court. While Cabela's is correct that Nebraska law recognizes the protection of confidential information as a legitimate business interest, I think the PMA noncompetition restrictions go beyond what is reasonably necessary to protect that interest. *See Brockley v. Lozier Corp.*, 488 N.W.2d 556, 564 (Neb. 1992). Section 1 of the PMA specifically addresses "Nondisclosure of Confidential Information." (D.I. 1-1, Ex. 1 § 1). Section 7, the noncompetition provision, adds substantially more restrictions—with broad geographic bounds

---

[6] It was not the length of time that was unreasonable, but the fact that the eighteen months began upon termination of employment "for any reason in any city," as opposed to when the employee last worked in the area covered by the noncompetition restrictions. *Securities Acceptance*, 106 N.W.2d at 466–67. The employee had worked at the employer's North Platte, Nebraska branch, but later transferred to the Omaha, Nebraska branch. *Id.* at 461. The noncompete covered the area associated with the North Platte branch, but the employer sought to enforce the noncompete from when the employee was terminated at the Omaha branch. *Id.* at 467. The court found the employer's interpretation consistent with the agreement, and thus found the restrictions unenforceable. *Id.*

(U.S. and Canada), the provision essentially prohibits all work in the industry for eighteen months following termination. (*See id.* § 7). I do not see why such restrictions are necessary, in addition to the nondisclosure provisions, to adequately protect Cabela's confidential information. Cabela's does not identify any circumstances that would warrant heightened protections. Thus, I find the noncompetition provision unenforceable under Nebraska law. Yet, I do not think it is so expansive as to be "oppressive to an employee," and thus it would be enforceable under Delaware law. Therefore, the application of Delaware law would be contrary to a fundamental policy of Nebraska.

### b. Nebraska has a Materially Greater Interest than Delaware in the PMA

In *Wellman*, the Court of Chancery recognized that Delaware has a general interest in enforcing a contract despite the contract having "no substantial relationship" to Delaware. 2018 WL 5309954, at *10. "Upholding freedom of contract is a fundamental policy" of Delaware. *Id.* "But, where it is clear that the policy of Nebraska is that the contract at issue is abhorrent and void, and where, as here, the formation and enforcement of the contract relate overwhelmingly to Nebraska, a general interest in freedom to contract is unlikely to be the equal of that public policy under the Restatement analysis." *Id.* (internal quotation marks and brackets omitted). The court thus found that Nebraska has a materially greater interest than Delaware in the PMA.

The *Wellman* decision followed the Court of Chancery's previous decision in *Ascension Insurance Holdings, LLC v. Underwood*, 2015 WL 356002 (Del. Ch. Jan. 28, 2015). Cabela's argues that *Ascension* is distinguishable. (D.I. 71 at 12 n.3). In *Ascension*, the court applied California law despite a Delaware choice-of-law provision, because California policy, enshrined in statute, provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." 2015 WL 356002, at *2 & n.4 (quoting Cal. Bus. & Prof. Code § 16600). Cabela's argues that California thus has a "unique

11

statutory policy," which Nebraska does not share. (D.I. 71 at 12 n.3). I disagree. As discussed in *Wellman*, Nebraska's policy is also set out in statute, which states, "Any contract . . . in restraint of trade or commerce shall be unlawful." 2018 WL 5309954, at \*9 (quoting Neb. Rev. Stat. § 59-1603). Further, also noted in *Wellman*, Cabela's fails to support its proposition that a "fundamental policy" must be enshrined in statute, as opposed to clearly expressed through the common law. *See id.*; (D.I. 71 at 12 n.3).

I find the court's reasoning in *Wellman* and *Ascension* persuasive. While Delaware's interest in freedom to contract is also related to a "fundamental policy," it is a more general interest than Nebraska's. Enforcing the noncompetition provision of the PMA, which almost exclusively relates to events occurring in Nebraska, would be directly contrary to Nebraska's policy against contracts in restraint of trade. I believe Nebraska's interest in upholding that specific policy, in conjunction with the many facts tying this case to Nebraska, is both material and greater than Delaware's general interest in enforcing a choice-of-law provision.

Therefore, the PMA meets both elements of the section 187(2)(b) exception and Nebraska law applies. As such, the PMA noncompetition provision is void as an unenforceable restriction on ordinary competition.

## 2. The PMA Nonsolicitation and Noncompetition Provisions are an Integrated Covenant Not to Compete

Defendants argue that the PMA nonsolicitation provisions are integrated with the noncompetition provision and thus also void. (D.I. 78 at 15–16).[7]

---

[7] The parties in *Wellman* did not discuss integration in their preliminary injunction briefing. The defendants raised the argument for the first time in their motion for reargument. The Vice Chancellor dismissed the argument as improperly raised. (D.I. 102, Ex. 1 at 4–5). Thus, the Vice Chancellor's analysis is inapplicable, as the issue is properly raised here.

Under Nebraska law, where multiple provisions of an agreement are found to create only one covenant not to compete, if any portion of the covenant is found invalid, the remainder of the covenant is likewise invalid. *See H&R Block Tax Servs. v. Circle A Enter.*, 693 N.W.2d 548, 553 (Neb. 2005). In *H&R Block*, the court struck down two subparagraphs of a franchise agreement. *Id.* The first subparagraph addressed nonsolicitation, while the second addressed noncompetition, and both imposed restrictions for a period of one year after termination of the franchise. *Id.* at 550–51. On appeal, H&R Block argued that although the noncompetition provision was invalid, the district court erred in failing to sever the nonsolicitation provision and independently address its validity. *Id.* at 552. The Nebraska Supreme Court rejected H&R Block's argument, finding that the subparagraphs "contain only one covenant not to compete, as both subparagraphs impose restrictions on the franchisee's posttermination competition." *Id.* at 553. The court thus found the nonsolicitation provision fell with the noncompetition provision. *Id.* The court, consistent with Nebraska jurisprudence, refused to strike or alter the language of the integrated covenant not to compete in order to make it enforceable. *Id.*

Here, sections 4, 5, and 6 of the PMA restrict the solicitation of customers, vendors, and employees, respectively. (D.I. 1-1, Ex. 1 §§ 4–6). Section 7 is the void noncompetition provision. (*Id.* § 7). The nonsolicitation provisions, like the noncompetition provision, are limited to eighteen months following termination of employment. (*Id.* §§ 4–7). Notably, those provisions are the only sections of the PMA that are limited to an eighteen-month enforcement period. Further, section 8(b) of the PMA provides that such eighteen-month period will be tolled if the employee breaches the PMA's "post-employment obligations." (D.I. 1-1, Ex. 1 § 8(b)).

Defendants argue that sections 4 through 7 together make up a "single integrated, unenforceable covenant not to compete, which cannot be saved by a severability clause." (D.I.

78 at 15). I agree. The PMA appears to describe all four sections as "post-employment obligations." (*See* D.I. 1-1, Ex. 1 § 8(b)). Like the nonsolicitation and noncompetition provisions in *H&R Block*, all four sections "impose restrictions on the [employee]'s posttermination competition." 693 N.W.2d at 553. Therefore, the nonsolicitation and noncompetition provisions of the PMA "contain only one covenant not to compete." *Id.* Since Nebraska courts consistently refuse to alter contract language to make a covenant not to compete enforceable, and having found the PMA noncompetition provision void, the nonsolicitation provisions must also be void. *See id.*

### 3. Cabela's is Likely to Succeed on the Merits of its Breach of Confidentiality Claim under the PMA

Section 1 of the PMA sets out several provisions relating to nondisclosure of confidential information. The PMA sets out a broad list of categories that may be included in "confidential information." (D.I. 1-1, Ex. 1 § 1(a)). The PMA prohibits the employee from disclosing confidential information during and after employment at Cabela's, with no time limitation, and provides that the employee acknowledges "unauthorized disclosure or use" would cause "irreparable damage" to Cabela's. (*Id.* § 1(b)).

#### a. The Confidentiality Provisions Are Enforceable Under Nebraska Law

Nebraska law recognizes the protection of confidential information as a legitimate business interest that may be protected by a valid covenant not to compete. *See Gaver*, 856 N.W.2d at 130–31. "[A]n employer has a legitimate need to curb or prevent competitive endeavors by a former employee who has acquired confidential information or trade secrets pertaining to the employer's business operations." *Boisen v. Petersen Flying Serv., Inc.*, 383 N.W.2d 29, 34 (Neb. 1986). But "a line must be drawn between the general skills and

knowledge of the trade and information that is peculiar to the employer's business." *Id.* (quoting

Restatement (Second) of Contracts § 188, comment g, at 45 (1981)) (internal brackets omitted).

The PMA provides a laundry list of categories for confidential information. (D.I. 1-1,

Ex. 1 § 1(a)). However, as Cabela's noted during oral argument, the confidentiality provisions

are not overbroad because they merely identify categories that "may" include confidential

information. (D.I. 107 at 60:2–19). It strikes me that the PMA's definition for confidential

information is so vague as to approach being meaningless. However, I appreciate that it is

difficult, looking forwards, to define what information will and will not be confidential over the

course of employment. Nebraska law appears to recognize a broad interest in protecting

confidential information. *See Gaver*, 856 N.W.3d at 131–31; *Boisen*, 383 N.W.2d at 34; *see also*

*Wellman*, 2018 WL 5309954, at *10 (upholding the PMA confidentiality provisions under

Nebraska law). Therefore, I find the PMA confidentiality provisions enforceable so long as they

only apply to information that is "peculiar to [Cabela's] business," rather than "general skills and

knowledge of the trade." *See Boisen*, 388 N.W.2d at 34.

### b. Defendants Likely Breached the Confidentiality Provisions

Cabela's argues that Defendants had broad access to confidential information while

employed. (D.I. 71 at 17). Access alone, however, does not show that Defendants improperly

disclosed or used such information. Cabela's provides evidence of two instances where Mr.

Highby allegedly misappropriated Cabela's confidential information to develop Highby

Outdoors. Both instances relate to information sent to Mr. Highby's personal email address.

Defendants respond that there is no evidence that Mr. Highby used any of that information in

breach of the PMA because, upon termination, he deleted all Cabela's information from his

personal email, in accordance with Cabela's policy. (*Id.*; D.I. 78 at 20 n.7). In the alternative,

Defendants argue that such information "is now valueless due to the passage of time and Bass Pro integration." (D.I. 78 at 7–10, 21–22).

First, Cabela's argues that Mr. Highby "requested and received forecasts for Highby Outdoors product categories, prepared by Cabela's employees while they were still employed by Cabela's and had access to Cabela's data." (D.I. 71 at 18). The record shows that Cabela's employees Wade Meier and Kendra Mitchell sent, to Mr. Highby's personal email address, three-year projections for Highby Outdoors of monthly sales figures for ammunition and cutlery, respectively. (D.I. 91-2, exs. 54, 55).[8] Both Mr. Meier and Ms. Mitchell later left Cabela's and joined Highby Outdoors. (D.I. 91-2, Ex. 51 at 29:8–13, Ex. 52 at 61:1–7). The emails were sent on March 28, 2018, shortly before Mr. Highby left Cabela's. (*Id.*; D.I. 1-1, Ex. 4). Mr. Larson compared those figures to projections generated from Cabela's internal database and found that they matched within tenths of a percentage point. (D.I. 72 ¶¶ 2–5). Defendants claim that the three-year projections were not based on Cabela's confidential information. (D.I. 78 at 21–22). Mr. Meier testified that the data he sent Mr. Highby was a "random guess" at what business could be for Highby Outdoors. (D.I. 79-1, Ex. 23 at 67:2–69:5). Ms. Mitchell testified that she only had access to Cabela's backwards-looking data, as opposed to forward-looking projections. (*Id.*, Ex. 32 at 18:15–19:9).

Second, Cabela's asserts that two days prior to his departure, Mr. Highby forwarded from his Cabela's email to his personal email "information for Cabela's merchandise regarding performance versus projected demand." (D.I. 71-2, Ex. 28). Defendants argue that Mr. Highby had a long-standing practice of forwarding emails to his personal address for ease of access while traveling. (D.I. 107 at 44:1–18).

---

[8] Ms. Mitchell testified that she did not send this particular version of the sales figures to Mr. Highby, but that she did "provide [her] input" in a different version. (D.I. 91-2, Ex. 52 at 66:9–67:7).

I think Cabela's is likely to succeed on its breach of confidentiality claim, at least with respect to the three-year projections.[9] It is hard to believe that one could generate data within tenths of a percentage point of the data generated from Cabela's internal database, without access to the confidential information in that database. I do not think Mr. Meier and Ms. Mitchell's testimony to the contrary is persuasive. I am also not persuaded by Defendants' argument that such information is "valueless" due to the passage of time and merger with Bass Pro. Cabela's remains a separate operating entity post-merger. (D.I. 107 at 64:21–65:6). Although competition "changes over time," I do not think Defendants are likely to show that the three-year projections generated in March of 2018 are now "valueless" simply due to the passage of time. (*See* D.I. 78 at 7–8).

Defendants do not dispute that Mr. Meier and Ms. Mitchell generated the projections for Highby Outdoors. (D.I. 78 at 21–22; *see also* D.I. 79-1, Ex. 23 at 67:2–69:5; D.I. 91-2, Ex. 52 at 66:9–67:7). The fact that Mr. Highby deleted the information from his personal email account, if true, does not necessarily mean that he is no longer able to use to information to benefit Highby Outdoors. The proximity between the timing of the emails and Mr. Highby's departure from Cabela's, as well as the fact that both Mr. Meier and Ms. Mitchell are now employed by Highby Outdoors, supports Cabela's theory that Mr. Highby sought and will use the projections for his new competing business. Therefore, I find that Cabela's is likely to succeed on the merits of its claim for breach of confidentiality under the PMA.

### 4. Cabela's Is Not Likely to Succeed on the Merits of its Trade Secrets Claim

---

[9] Cabela's second allegation—the forwarded email—is less compelling. Defendants have asserted that all Cabela's emails were deleted from Mr. Highby's personal account, and, based on the content of the email (one page of pricing and demand information for a handful of specific product lines), it is not clear that the email is likely to be used to benefit Highby Outdoors. (D.I. 71-2, Ex. 28).

To succeed on a claim for misappropriation of trade secrets, Cabela's must show:

> (1) the existence of a trade secret or secret manufacturing process; (2) the value and importance of the trade secret to the employer in the conduct of his business; (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice.

*Richdale Dev. Co. v. McNeil Co.*, 508 N.W.2d 853, 859 (Neb. 1993). Cabela's trade secrets claim is essentially the same as its breach of confidentiality claim. Cabela's argues that the confidential information that Defendants allegedly took and used also constitute trade secrets. (D.I. 71 at 20). Cabela's does not identify the existence of particular trade secrets. (*Id.* at 20–22).

Cabela's conclusory statement that whatever confidential information Defendants may improperly use or disclose also includes trade secrets is insufficient to meet its burden for misappropriation of trade secrets. Therefore, Cabela's has failed to show a likelihood of success on its trade secrets claim.

## B. Irreparable Harm to Cabela's

Defendants stipulated in the PMA that breach of confidentiality "would cause irreparable damage to the business of [Cabela's]." (D.I. 1-1, Ex. 1 § 1(b)). Cabela's argues that, under Delaware law, irreparable harm is met by Defendants' contractual stipulation alone. (D.I. 71 at 22–23); *see also, e.g.*, *AM Gen. Holdings LLC v. Renco Grp., Inc.*, 2012 WL 6681994, at *4 (Del. Ch. Dec. 21, 2012) ("Under Delaware law, a contractual stipulation of irreparable harm may suffice to demonstrate irreparable harm." (internal quotation marks omitted)); *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 44 (Del. Ch. 1997). I do not think Delaware law applies. The federal standard for preliminary injunction controls in a diversity case. *Instant Air*

*Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989). Further, if state law applies, it would be Nebraska law—the PMA is governed by Nebraska, not Delaware, law.

Federal courts are somewhat divided as to whether a contractual stipulation alone may show irreparable harm. *Compare Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) (finding the district court acted within its discretion by looking beyond the parties' contractual stipulation to determine whether plaintiff had established irreparable harm), *with Am. Impex Corp. v. Int'l Ace Tex, Inc.*, 2009 WL 3963791, at *3 (C.D. Cal. Nov. 16, 2009) (following Delaware law and finding that plaintiff demonstrated irreparable harm by contractual stipulation). The Fourth and Tenth Circuits have held that contractual agreements do not control the district court's exercise of its equitable discretion. *Bethesda Softworks*, 452 F. App'x 351, 353 (4th Cir. 2011); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004). The Second Circuit has implied the same. *See Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm met in part by the contractually stipulated harm). Likewise, in the Third Circuit, district courts have treated contractual stipulations as relevant but non-dispositive factors in establishing irreparable harm. *See Hadeed v. Advanced Vascular Res. of Johnstown, LLC*, 2016 WL 7176658, at *4 (W.D. Pa. Dec. 8, 2016) (finding the contractual stipulation "leans in favor of a finding of irreparable harm"); *Robert Half Int'l, Inc. v. Stenz*, 2000 WL 1716760, at *6 (E.D. Pa. Nov. 17, 2000) (conducting an independent analysis of irreparable harm despite a contractual stipulation).

It appears that most federal courts do not consider a contractual stipulation dispositive for purposes of showing irreparable harm. Therefore, I find that the PMA stipulation is merely one factor that favors finding irreparable harm.[10]

Aside from the PMA stipulation, Cabela's argues that Highby Outdoors is in a unique position to inflict harm because Defendants learned information while employed that can be used to identify and exploit Cabela's weaknesses. (D.I. 107 at 63:25–64:9). It is important to distinguish between the unlawful use of confidential information and the lawful use of general knowledge and skills. *See Boisen*, 383 N.W.2d at 34. Cabela's must show irreparable harm stemming from Defendants' unlawful behavior, not merely harm from ordinary competition. *See id.* Irreparable harm can be found based on a determination that an employee is likely to use confidential information, obtained through employment, to his employer's detriment. *See Fresco Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 75–76 (3d Cir. 2017) (upholding the district court's finding of irreparable harm to the employer because the employee was "likely to use his confidential knowledge to [the employer's] detriment," and where the employee intended to work for a competitor in the same role, industry, and geographic region); *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 173–74 (3d Cir. 2015) (similar holding); *cf. Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727, 732 (3d Cir. 2009) (finding no irreparable harm because the confidential information had already been used for its intended purpose, thus eliminating any threat of future harm). The confidential information need not

---

[10] Nearly all of Cabela's substantive arguments focus on the PMA stipulation. (D.I. 71 at 22–24). Cabela's makes a cursory attempt to argue that Defendants' alleged misappropriation of trade secrets independently shows irreparable harm. (*Id.* at 23). That argument fails because, as discussed *supra*, Cabela's does not provide any evidence that trade secrets exist, let alone that they were misappropriated.

actually be disclosed or used—threatened disclosure or use may be sufficient to warrant injunctive relief. *See Fres-co*, 690 F. App'x at 75–76; *HR Staffing*, 627 F. App'x at 173–74.

Cabela's has shown that Defendants likely obtained and intended to misuse confidential information, namely the three-year financial projections for Highby Outdoors based on Cabela's internal data. *See supra*. Cabela's has also provided evidence that Highby Outdoors is meant to be a direct competitor. (D.I. 71-1, Ex. 2 at HBY-0000010 (Highby Outdoors business plan naming Cabela's and Bass Pro as competitors)). Thus, in light of *Fres-co* and related Third Circuit caselaw, I think Cabela's has shown an imminent threat of misuse of the three-year projections sufficient to support a likelihood of irreparable harm absent an injunction.

It is important to note, however, the magnitude of the likely harm. The specific harm at issue—based on use of the three-year projections—is unlikely to result in substantial injury to Cabela's. The information relates to two specific categories of goods (ammunition and cutlery) and are estimates based on backwards-looking data. (D.I. 91-2, exs. 54, 55). Whatever value the projections have will inevitably decrease over time. (*See* D.I. 78 at 7–8). Therefore, I find that Cabela's has shown a likelihood of irreparable, but minimal, harm.

### C. The Balance of the Equities and the Public Interest

Defendants assert that, as a practical matter, an injunction will put Highby Outdoors out of business. (D.I. 78 at 24). Defendants have leased office space and hired employees— expenses that they cannot afford if they are enjoined from starting operations. (D.I. 107 at 55:6– 9 (stating that Highby Outdoors would fail within nine months)).

Cabela's argues that Defendants are free to pursue other avenues of business, and to allow Defendants to continue with Highby Outdoors in violation of the PMA denies Cabela's the benefit of its bargain. (D.I. 71 at 24–25). Cabela's has a legitimate business interest in

21

preventing the disclosure or misuse of its confidential information.  Defendants voluntarily agreed to the PMA confidentiality terms and received valuable stock in return.  (*Id.*; D.I. 1-1, exs. 1–2).

There is a strong public interest in upholding contractual agreements.  *Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 434–35 (3d Cir. 2005).  There is also a strong public interest in allowing ordinary competition.  *See Chamber-Dobson*, 472 N.W.2d at 398.  Cabela's has the right to enforce the PMA confidentiality provisions but may not use those provisions to obtain the benefits of the void noncompetition provision.  An injunction based on the threatened breach of confidentiality is particularly concerning because, unlike the PMA noncompetition and nonsolicitation provisions, the confidentiality provisions are not time limited.  Further, Defendants do not have access to new confidential information, and the value of any information they do have will decrease over time.

On balance, I think the harm to Cabela's from possible misuse of the three-year projections is outweighed by the public interest in ordinary competition and the likelihood that an injunction would prevent Defendants from ever operating Highby Outdoors.  Therefore, I find Cabela's has failed to establish that a preliminary injunction should be granted.

## IV.    CONCLUSION

For the foregoing reasons, Cabela's motion for preliminary injunction (D.I. 70) is **DENIED**.

IT IS SO ORDERED this $\underline{24}$ day of January 2019.

_____

United States District Judge